# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RICHARD ANDREW WACHTA MCCLARY,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:07-cv-0845** |
| | ) | **Judge Trauger** |
| **FLORENCE ELIZABETH MORRISON MCCLARY,** | ) | |
| | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

On August 20, 2007, Richard Andrew Wachta McClary filed a Petition for Return of Children to Petitioner, seeking the return of his two minor children, Harrison Bush McClary, age fourteen, and Tydings Morrison McClary, age eleven, to Germany. The respondent, Florence Elizabeth Morrison McClary, mother of the children and wife of the Petitioner, refused to return the children to Germany following the children's scheduled four-week visit to Murfreesboro, Tennessee. Petitioner has filed a Motion for Summary Judgment (Docket No. 11), to which the Respondent has responded (Docket No. 23), and the Petitioner has replied (Docket No. 27).

## FACTUAL BACKGROUND

Petitioner and Respondent, both American citizens, married in 1984 in Nashville, Tennessee.[1] In 1987, they moved to Frankfurt, Germany, where their eldest child was born. In

---

[1]Unless otherwise noted, the facts are drawn from the parties' summary judgment briefs (Docket Nos. 12, 23, and 27), the parties' affidavits (Docket Nos. 13 and 25), the Respondent's Response to Statement of Undisputed Facts (Docket No. 24), and the Petitioner's Response to

1

1990, they returned to the United States and moved to New Jersey. While living in New Jersey, they had two more children, who are the subjects of this action: Harrison Bush McClary was born in 1993, and Tydings Morrison McClary was born in 1996.

Shortly after Tydings' birth in January 1996, the Petitioner moved to Dusseldorf, Germany to accept a job there. Although the Respondent asserts that she did not enjoy living in Germany previously and preferred to remain in the United States, she and the children joined the Petitioner in Germany in June 1996. According to the Respondent, when she and the children moved to Germany, they left a number of their belongings in storage in the United States and expected to return to the United States when the Petitioner's six-month job contract expired. However, at the end of his contract, the Petitioner obtained a new contract and subsequently continued to "sign on" for six or eight month terms over the next several years, and the family thus remained in Germany until April 2001. During that time, the family lived in two different apartments and attended a local church. According to the Respondent, she felt isolated and strongly disliked living in Germany and wished to return to the United States, but the Petitioner refused. As the Respondent did not work outside the home or have access to the family's bank accounts, she could not finance a move herself.[2]

In April 2001, the Respondent and the children moved from Dusseldorf to Nashville, Tennessee, where the children attended school and participated in church activities. According

Respondent's Additional Facts (Docket No. 28). Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

[2]The Petitioner denies the Respondent's allegations that he would not permit her to return to the United States. (Docket No. 28 ¶ 59)

2

to the Respondent, she and the Petitioner were estranged until early 2002, when the Petitioner also returned to the United States from Dusseldorf and reconciled with the Respondent.[3] The entire family relocated to Smyrna, Georgia, where the Petitioner found work. Then, in early 2003, the Respondent and the parties' eldest child moved from Smyrna to the Nashville area to obtain treatment for the child's physical and psychological problems. Harrison and Tydings joined the Respondent in Tennessee in August 2003, while the Petitioner remained in Georgia and then moved briefly to his parents' home in Etowah, Tennessee.

In early 2004, the parties once again reconciled, and the Petitioner once again suggested moving to Germany. The Respondent initially was strongly opposed to such a move but eventually agreed to return to Germany on a "trial basis."[4] The children moved to Regensburg, Germany in May 2004, where they stayed with family friends until they were joined by the Respondent in August 2004 and the Petitioner in October 2004. According to the Respondent, the family shipped one container of household items to Germany, leaving behind a car and a "large portion" of their belongings in light of the fact that the move was to be a trial.[5] Once in Germany, the family moved into a rented house and joined a church. Initially, the Petitioner commuted every week to a job in Munich and subsequently worked in Regensburg as an English

---

[3]To the extent that the Respondent alleges that she and the Petitioner experienced difficulties in their marriage and were estranged and reconciled at various points, the Petitioner denies those allegations. (*See* Docket No. 28 ¶¶ 57, 61, 63, 66, 70)

[4]The Petitioner disputes that the move was a trial and asserts that the family's intention was to make Germany its home. (Docket No. 27 at 5; Docket No. 28 ¶¶ 66, 69)

[5]According to the Petitioner, the Respondent's car was sold prior to the move to Germany, and the household goods sent to Germany "contained everything needed for the family to indefinitely live in Germany and not just things needed for a temporary stay." (Docket No. 28 ¶ 69)

3

teacher and translator.[6]  Harrison and Tydings, both of whom speak German fluently, attended

school, took guitar lessons and karate, played soccer, and were involved in church activities.

However, the parties' marriage deteriorated again after the move, and the Respondent

developed health problems and an alcohol addiction.  The Respondent claims that, in 2005, she

sought to return to the United States, but the Petitioner refused.[7]  In February 2006, the

Respondent's parents purchased a plane ticket so that the Respondent could return to the United

States and enter a four-week inpatient alcohol rehabilitation program in Tennessee.  After

completing her rehabilitation in early 2006, the Respondent did not return to Germany as the

Petitioner expected and moved instead to Murfreesboro, Tennessee.  Harrison and Tydings

visited the Respondent in Murfreesboro during the summer of 2006, returning to Germany at the

end of their visit.  The Respondent asserts that she wished to keep the children in the United

States at that time, but that her health and ongoing recovery prevented her from doing so.

Harrison and Tydings were again scheduled to visit the Respondent in Tennessee for four

weeks during the summer of 2007, arriving in Tennessee on July 30, 2007.  In an email to the

Petitioner dated July 27, 2007, immediately prior to the children's arrival, the Respondent

confirmed that the children would return to Germany on September 6 or 7, 2007.  On August 1,

2007, however, immediately after the children's arrival, the Respondent filed a petition for a

divorce in Rutherford County, seeking custody of the children and a temporary restraining order

against the Petitioner.  On August 3, the Respondent informed the Petitioner that she was

---

[6]The Respondent alleges that the Petitioner has not had steady employment in Germany since that time, which the Petitioner denies.  (Docket No. 28 ¶ 71; *see also* Docket No. 24 ¶ 32)

[7]Again, the Petitioner denies the allegation that he refused to allow the Respondent to return to the United States.  (Docket No. 28 ¶¶ 72-73)

seeking a divorce and did not intend to return the children to Germany. Since then, the Respondent has enrolled the children in school in Murfreesboro, where they also attend church and participate in sports.

On August 20, the Petitioner filed a petition with this court seeking the return of the children to Germany.[8]

## ANALYSIS

The Petitioner seeks the return of the children to Germany pursuant to the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11611. ICARA was enacted to implement the provisions of the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 49 [hereinafter "Hague Convention" or "Convention"]. Both the United States and Germany are signatories of the Hague Convention. *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) [hereinafter *Friedrich I*]; *see* Hague Conference on Private International Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M. 225, 225 (1994).

The Petitioner now seeks summary judgment.

## I.      Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[8]Since filing the divorce petition and the Hague Convention petition, the parties have communicated to some degree about their dispute, and the Petitioner visited the children in Murfreesboro. Moreover, the Respondent indicated that she might consider permitting the older child, Harrison to return to Germany, although to date both children remain in Murfreesboro. (Docket No. 24 ¶ 24)

5

judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

This type of case is appropriate for summary judgment, and, indeed, the language of the Convention supports resolution by such means. *See March v. Levine*, 136 F. Supp. 2d 831, 833 (M.D. Tenn. 2000) [hereinafter *March I*]. Article 11 of the Convention provides that a court, when faced with a petition under the Convention, "shall act expeditiously in proceedings for the return of children." Hague Convention, art. 11. Moreover, there is no requirement under the Hague Convention or under ICARA that discovery be allowed or that an evidentiary hearing be conducted. *See Sinclair v. Sinclair*, No. 96-1015, 1997 U.S. App. LEXIS 19951, at *4 (6th Cir. Jul. 30, 1997) (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994) and finding appellant's argument that district court refused to hear testimony of two witnesses to be without merit). Thus, under the guidance of the Convention and the statutory scheme, the court

6

is given the authority to resolve these cases without resorting to a full trial on the merits or a plenary evidentiary hearing.

## II.    The Hague Convention and ICARA

The Hague Convention was adopted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble; *see also* 42 U.S.C. § 11601.

Under the Hague Convention and its implementing statute, ICARA, custody and visitation rights are to be determined in the courts of the country that is the "habitual residence" of the children.  Hague Convention, art. 19; 42 U.S.C. § 11601(b)(4).  The prime purpose of the Convention and ICARA is to "discourage those who would remove or retain children in the hopes of seeking a 'home court advantage' by ensuring that children wrongfully removed or retained would be returned to their place of habitual residence so that custody determinations are made there."  *March v. Levine*, 249 F.3d 462, 472 (6th Cir. 2001) [hereinafter *March II*]; *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) [hereinafter *Friedrich II*] ("[T]he Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.").

This case involves an allegedly wrongful retention, which is defined as "the act of keeping the child without the consent of the person who was actually exercising custody." *March I*, 136 F. Supp. 2d at 835 (citing 51 Fed. Reg. 10494, 10503 (1986) (Hague International Child Abduction Convention: Text and Legal Analysis)).  The retention of a child is wrongful when "it is in breach of rights of custody attributed to a person, an institution or any other body,

7

either jointly or alone, under the law of a state in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."  Hague Convention, art. 3.  ICARA specifies that an individual seeking the return of a wrongfully retained child may "commence a civil action by filing a petition" in a court with jurisdiction over the action.  42 U.S.C. § 11603(b).  The federal district courts and state courts have concurrent jurisdiction over such actions.  42 U.S.C. § 11603(a-b).  However, a federal district court's determination of the merits of a petition for the return of a child brought under the Convention emphatically is not a ruling on the merits of any underlying custody dispute.  Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); *see also March II*, 249 F.3d at 472 (describing the merits of an underlying custody dispute as "forbidden territory" for courts exercising jurisdiction under the Hague Convention); *Friedrich II*, 78 F.3d at 1063 ("[A] court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute.").

If a petition is filed within a year of a child's retention, and a court finds that the retention was wrongful, the court must order the child's return to his state of habitual residence.  Hague Convention, art. 12.  However, the court may not order a child's return if one of several exceptions provided by the Convention applies.  *See* Hague Convention, arts. 12-13, 20.  Only one of these exceptions is at issue here: if the "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views," the

8

court may take those views into account and decline to return the child. *See* Hague Convention, art. 13.

The Petitioner initially bears the burden of demonstrating by a preponderance of the evidence that the children's retention was wrongful under the Convention. 42 U.S.C. § 11603(e)(1)(A). If the Petitioner carries this burden, the burden then shifts to the Respondent to establish by a preponderance of the evidence that the children have reached an age and degree of maturity such that the court may take account of their views. *See* 42 U.S.C. § 11603(e)(2)(B); *Friedrich I*, 983 F.2d at 1400.

  *A. Wrongful Retention*

To carry his burden of establishing by a preponderance of the evidence that the children were wrongfully retained in the United States, the Petitioner must establish that Germany was the children's "habitual residence" at the time the Respondent retained them in the United States, and that the Petitioner would have exercised custody rights at the time of the retention had the children not been retained. *Friedrich I*, 983 F.2d at 1400.

  1. Habitual residence

The Petitioner argues vehemently that the children's habitual residence is Germany, while the Respondent counters that their habitual residence is in fact the United States.

Neither the Convention nor ICARA defines "habitual residence." The Sixth Circuit has stated that habitual residence is not to be confused with "domicile" and that courts must "focus on the child, not the parents, and examine past experience, not future intentions" in determining a child's habitual residence. *Id.* at 1401. "On its face, habitual residence pertains to customary residence prior to removal. The court must look back in time, not forward." *Id.* In *Feder v.*

*Evans*, the Third Circuit provided further guidance for determining a child's habitual residence, relying on *Friedrich I* and holding that "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." 63 F.3d 217, 224 (3d Cir. 1995). The relevant period for determining a child's habitual residence is the time "immediately preceding" the retention. *Id.*

In holding that the habitual residence inquiry focuses on "past experience, not future intentions," the Sixth Circuit in *Friedrich I* stated that the future intentions of the parents are "irrelevant." 983 F.2d at 1401. Thus, the *Friedrich I* court dismissed arguments that "pertain[ed] to the future" and "reflect[ed] the intentions of [the mother]." *Id.* (holding child's habitual residence was Germany because child was born there and lived there his entire life, despite the fact that his mother, a member of the armed forces, intended to return to the United States upon her discharge).

At the time of the *Friedrich I* ruling, the Sixth Circuit was one of the only circuit courts of appeals to have addressed the question of how to determine a child's habitual residence under the Convention. Since then, other circuit courts have addressed the subject, and some have taken issue with *Friedrich I*'s admonition that the intent of the parents is irrelevant in determining a child's habitual residence. *See, e.g.*, *Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir. 2001); *see also Robert v. Tesson*, No. Civ. A. 1:04-CV-333, 2005 WL 1652620 (S.D. Ohio June 29, 2005) (discussing criticisms of *Friedrich I* and evaluating intent of the parents in determining child's habitual residence).

10

The Ninth Circuit in *Mozes* stated that "the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." 239 F.3d at 1075. The Court rejected the *Friedrich I* approach treating the parents' intent as irrelevant, noting that children generally "lack the material and psychological wherewithal" to determine their residence and concluding instead that, "where intention or purpose is relevant, . . . the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence." *Id.* at 1076 (quotation and citation omitted). Of course, in many cases arising under the Hague Convention, the persons who are entitled to fix the place of a child's residence—usually the parents—cannot agree. The *Mozes* court thus divided such cases into three categories to assist courts in determining a child's habitual residence.

First, where "a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another," courts "are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose." *Id.* at 1077. In the second category, "cases where the child's initial translocation from an established habitual residence was clearly intended to be of a specific delimited period," courts "have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Id.* The final, and most difficult category of cases, are those in which "the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous determination." *Id.* In such cases, courts sometimes find that, "despite the lack of perfect consensus[, the parents] have shared a settled mutual intent that the stay last indefinitely," and thus courts may "infer a mutual abandonment of the child's prior

11

habitual residence." *Id.* Alternatively, courts may find that there was "no settled mutual intent from which such abandonment can be inferred" in such cases. *Id.*

The merits of the petition will be addressed with these criticisms of *Friedrich I* in mind, but with full awareness that *Friedrich I* remains the law in this Circuit.

a. Experience

The Respondent urges that the children's habitual residence has been the United States throughout their entire lives, despite numerous moves between the United States and Germany. It is unnecessary, however, to embark on an extended analysis of the children's habitual residence at each phase of their lives. Assuming that their habitual residence at some point was the United States, as the children were both born in the United States, have extended family here, and lived and attended school here from 2001 through 2004, the only relevant inquiry is whether the children abandoned the United States as their habitual residence in favor of Germany upon or subsequent to the family's 2004 move.

A child's habitual residence is not "easily altered" and can be altered only by "a change in geography and the passage of time." *Friedrich I*, 983 F.2d at 1401 (finding that child's three-day stay on a U.S. military base was insufficient to establish the United States as his habitual residence). A person may have only one habitual residence at any point in time, *see id.*, and may abandon a previous habitual residence "without intending to occupy the next one for more than a limited period," *Mozes*, 239 F.3d at 1075; *see also March I*, 136 F. Supp. 2d at 840 ("[T]he cases are clear that there need not be a decision to remain somewhere indefinitely for it to be considered the child's habitual residence."). The fact that the children are United States citizens does not alter the calculus, *see Friedrich I*, 983 F.2d at 1401 (finding that citizenship was

12

insufficient to establish that child was a habitual resident of the United States), nor does the fact that the children have spent a large portion of their lives in the United States, as it is the time period immediately preceding their retention in the United States that is at issue in determining their habitual residence, *Feder*, 63 F.3d at 224 (finding the fact that child lived in the United States for six years was not relevant where he was habitually resident in Australia during the six months immediately preceding his retention in the United States).

When the family moved to Germany in 2004, the children moved first, in May, and stayed with family friends until their parents joined them and rented their own home later that year. The children were enrolled in school—one of the "central activities" of a child's life, *Feder*, 63 F.3d at 224; *see also March I*, 136 F. Supp. 2d at 839 (citing *Feder* and relying on school attendance in holding that children's habitual residence was Mexico)—and the family became involved in a local church. The children also participated in karate, took music lessons, and befriended other children at school and in their neighborhood. They maintained both German and English language skills, and became familiar with the culture and geography of the town and the country in which they lived. Since 2004, they have lived in Germany continuously for more than three years, save for several trips of limited duration to the United States, from which they have always returned to Germany until their most recent trip.

Since most recently moving to Germany, the McClary children have experienced both a change in geography and the passage of a substantial amount of time—over three years—during which they were engaged in the usual day-to-day activities of children their ages. Additionally, the children appear to have attained a degree of settled purpose in Germany, and statements made by the children during *in camera* interviews indeed bolster the conclusion that Germany

13

was their habitual residence at the time of their retention in the United States. Both children stated that they were involved in school, music, sports, and church activities in Germany. Both had made friends with children at school and in the family's neighborhood, and both were fluent in the language and culture in which they were immersed.

Moreover, the older child, Harrison, stated that, when the family moved back to Germany in 2004, he believed that they would remain there from quite some time. Tydings, the younger child, stated that, though he initially believed the family would remain in Germany for only a short while when they moved in 2004, he later came to believe that they would stay in Germany for a longer period of time. He indicated that he came to this realization when he was about ten years old, and around the time that the Respondent returned to the United States to enter the alcohol rehabilitation program. The interviews make clear that, prior to their July 2007 visit to the United States, the McClary children expected to remain in Germany "for at the very least the foreseeable future." *Feder*, 63 F.3d at 224.

The Respondent attempts to paint the Petitioner as manipulative and controlling, and she implies that she was coerced or forced to remain in Germany against her will. A habitual residence may not be established if one party's presence in the country is obtained by coercion. *Silverman v. Silverman*, 338 F.3d 886, 900 (11th Cir. 2003) ("Habitual residence is not established when the removing spouse is coerced involuntarily to move to or remain in another country."). However, though it is clear that the Respondent was highly ambivalent about living in Germany and encountered significant psychological difficulties while living there, there is no evidence other than the Respondent's own allegations that her presence in Germany was coerced. *See Ponath v. Ponath*, 829 F. Supp. 363, 367 (D. Utah 1993) (finding respondent's

14

allegations of abuse credible where allegations were "supported by the evidence and testimony regarding petitioner's egregious conduct regarding his confrontation of the respondent . . . and the steps he was apparently prepared to take to force his will upon respondent, contrary to law").

Both the objective evidence about the children's lives in Germany and their own statements indicate that, immediately prior to their retention in the United States, Germany was their habitual residence.

> b.      Intent

As was the case in *Friedrich I*, the Respondent here premises much of her argument that the children's habitual residence is the United States on her own intentions, rather than on the children's past experiences. Although the preceding analysis of the McClary children's experiences is sufficient to conclude that Germany is their habitual residence under *Friedrich I*, it is worthwhile to address briefly the Respondent's allegations that she and the Petitioner never manifested a shared intent to abandon the United States as their habitual residence in favor of Germany. *See, e.g.*, *Mozes*, 239 F.3d at 1076 ("[I]n those cases where intention or purpose is relevant . . . the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence.") (quotation and citation omitted); *Gitter v. Gitter*, 296 F.3d 124, 134 (2d Cir. 2005) ("[I]n determining a child's habitual residence, a court should apply the following standard: First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. . . . Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.").

15

According to the Respondent, because of the state of her marriage, she was strongly opposed to moving to Germany when the Petitioner first proposed a move in 2004. (Docket No. 23 at 5) She eventually agreed to return to Germany on a "trial basis," with her stay conditioned on improvements in the parties' relationship. (Docket No. 23 at 5, 19-20) Thus, according to the Respondent, the family left their car and a "large portion" of their belongings in the United States. (Docket No. 28 ¶ 69) The Petitioner denies any knowledge of the Respondent's belief that the move constituted a trial or was conditional in any way and asserts that the goods the family took to Germany were sufficient to establish a permanent household there. (Docket No. 27 at 5; Docket No. 28 ¶¶ 66, 69) Shortly after the move, both the parties' marriage and the Respondent's health deteriorated. (Docket No. 23 at 18) The Respondent eventually left Germany to enter an inpatient alcohol rehabilitation program in the United States, although she claims that she "never abandoned her intent and hope of bringing the children back" to the United States when she left for treatment. (Docket No. 23 at 18) The Respondent claims that because she was hesitant about the decision to move to Germany given her deteriorating marriage, and because her staying in Germany was conditioned on her marriage improving, which it never did, the parties never had a shared intent to establish Germany as the family's habitual residence. (Docket No. 23 at 18-19)

Applying the framework articulated in *Mozes*, however, this case clearly falls into the first category of cases: those in which the "family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another." 239 F.3d at 1077. The family moved as a unit to Germany. Indeed, the children moved to Germany ahead of the Respondent and the Petitioner so that they could become reacclimated to Germany prior to

16

starting school.  (Docket No. 28 ¶ 67)  Further, there is no evidence that the family needed, or would ever again need, the car they allegedly left behind in the United States.  Nor is the fact that they left household goods behind necessarily illustrative of their lack of a shared intent to abandon the United States as a habitual residence; there is no evidence, other than the Respondent's uncorroborated assertions, that the family did not possess in Germany everything that was necessary to establish a household there.  There also is no evidence that the parties mutually viewed the move as conditional or limited in time.

As the Respondent and the Petitioner shared, at least initially, an intent to abandon their previous habitual residence of the United States in favor of Germany, the reservations that the Respondent had about that move cannot undo the fact that the family did establish a habitual residence in Germany.  A parent's hesitant decision to move, even in light of a deteriorating marriage, does not prevent a child from becoming habitually resident in a new country.  *See Feder*, 63 F.3d at 224.

The arguments made by the Respondent are strikingly similar to those made by the respondent in *Feder*.  There, the child's mother claimed that she had been "ambivalent" about the family's move to Australia in light of her deteriorating marriage.  *Id.* at 219.  She claimed that she was "not committed to remaining" in Australia, and she "discussed her unhappiness in the marriage as well as her desire to return to the United States" with her husband shortly after arriving in Australia.  *Id.*  Some months later, the respondent in *Feder* made plans for herself and her son ostensibly to visit the United States and then remained in the United States, where she sought a divorce and custody of her son.  *Id.* at 219-20.  The Court found that the child's habitual residence was Australia, stating that "the fact that [the respondent] did not intend to remain in

Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where [the petitioner] had found work." *Id.* at 224.

Overall, this case bears more similarity to *Feder* than to *Ruiz v. Tenorio*, 392 F.3d 1247 (11th Cir. 2004), an Eleventh Circuit case involving similar issues on which the Respondent relies. In *Ruiz*, the child's mother, like the Respondent here, alleged that she and her husband did not have a shared intent to abandon their habitual residence of the United States in favor of Mexico, because the parties had agreed to move to Mexico on a trial basis and never shared an intent to abandon the United States as their habitual residence. *See id.* at 1250. The Court agreed, finding that the case fell into the third *Mozes* category on the basis of evidence indicating that *both* parties viewed the move as conditional and in the nature of a trial. *Id.* at 1257. Additionally, the family maintained bank accounts, credit cards, and a mailing address in the United States, and there was evidence that both parties had "second thoughts" about the move. *Id.* at 1254. Although the parties had agreed to live in Mexico for a length of time of ambiguous determination, the court held that there was no shared intent to abandon the United States as the family's habitual residence.

There are no objective facts in this case, as there were in *Ruiz*, that indicate that the parties lacked a settled and shared intent to make Germany their habitual residence. As in *Feder*, the parties took steps together to move to Germany, and the Respondent's internal hesitations and personal intention not to live in Germany permanently do not void the fact that Germany became the family's habitual residence following the 2004 move.

18

2.        Custody rights

To establish that the children were wrongfully retained in the United States, the Petitioner bears the burden of establishing not only that Germany was their habitual residence, but also that he would have exercised custody rights had the children not been retained in the United States. Under the Hague Convention, a parent's custody rights "must be determined under the law of the child's habitual residence." *Friedrich I*, 983 F.2d at 1402. Additionally, "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich II*, 78 F.3d at 1066.

Under German law, both parents share equal *de jure* custody of a child, which continues unless and until a court rules otherwise. *See Friedrich II*, 78 F.3d at 1064 (citing German Civil Code 1626(1)); *Bader v. Kramer*, 484 F.3d 666, 670 (4th Cir. 2007) ("German law vests both parents with joint custody of a child until a competent court enters a contrary order."). Thus, the Petitioner had custody rights under German law. The Respondent does not argue otherwise and does not claim that the Petitioner would not have continued to exercise those custody rights, had she not retained the children in the United States. (Docket No. 24 ¶ 36) Moreover, the Respondent does not assert any facts that demonstrate a clear and unequivocal abandonment of the children by Petitioner. Indeed, it is the Petitioner who has cared for the children over the last year and a half, with the brief exceptions of several visits with the Respondent in the United States, and, by all accounts, the Petitioner would have continued to exercise those rights but for the Respondent's retention of the children in the United States.

19

The Petitioner has demonstrated not only that the children were habitually resident in Germany at the time of their retention in the United States, but also that he would have exercised his custody rights at that time if not for their retention. Thus, the Petitioner has satisfied his burden of establishing by a preponderance of the evidence that the children were wrongfully retained from Germany.

B.    *Maturity Exception*

As the Petitioner has satisfied his burden, the court must order the children's return to Germany unless the Respondent demonstrates, by a preponderance of the evidence, that the children "[object] to being returned and [have] attained an age and degree of maturity at which it is appropriate to take account of [their] views." Hague Convention, art. 13.

The Convention does not establish a minimum age at which a child is old enough and mature enough for his or her views to be taken into account. The determination of a child's maturity level is "fact-intensive and idiosyncratic." *DeSilva v. Pitts*, 482 F.3d 1279, 1286 (10th Cir. 2007). Here, the Respondent argues that the McClary children, ages eleven and fourteen, are sufficiently intelligent, mature, and capable of making a decision about where they would prefer to live. (Docket No. 23 at 21-22) Both children were interviewed by the court *in camera*, separately, without the presence of the parties or counsel,[9] to determine both their respective maturity levels and their preferences with regard to living in the United States versus Germany.

Both Harrison and Tydings are intelligent and polite children who seem to be coping well, given their difficult family situation. Harrison particularly is very self-confident, has done

---

[9]This interview was on the record, but any transcript prepared thereof will remain under seal.

very well in school in both Germany and in the United States, and has made a number of friends in Germany. He also was involved in karate, church activities, and music in Germany. He stated that, given the choice, he would prefer to return to Germany. He acknowledged that he missed his mother, although he had become accustomed to her living apart from the rest of the family. He also noted that he has moved a number of times during the course of his life and seemed to crave the stability of continuing to live in Germany at this point in his life.[10]

Tydings, by contrast, stated that he has only one good friend in Germany, whereas he has made a number of friends since starting school in the United States. He also stated that he had some difficulty in his German school and that he found his Latin class particularly challenging. He wanted to drop down a level in his German school although he admitted that one of his reasons was so that we would be in the same level as his friend. He added that he felt different from other students in his German school, and that he did not enjoy having other students ask him about his experiences in the United States. He also stated that he enjoys playing soccer and that he is better able to play soccer in the United States than in Germany because the sport is taken much less seriously here. Given the choice, Tydings stated that he would prefer to remain in the United States because he feels more "at home" here, despite the fact that he has lived in Germany for most of his life and speaks with a pronounced German accent. Tydings acknowledged that he would be lonely if he remained in the United States and Harrison returned to Germany but stated he would become accustomed to it, as he has already become accustomed to his older sister's living in another country.

_____

[10]Although the Respondent describes Harrison's feelings toward Germany as "mixed," (Docket No. 23 at 22), she has indicated to the Petitioner that she might be willing to permit Harrison to return to Germany, (Docket No. 24 ¶ 24), presumably in light of his desire to do so.

21

Without question, Harrison has reached an age and maturity level at which his preference may be taken into account. Although the Respondent implies that Harrison's preference should be disregarded as it is the result of "an internal struggle . . . fueled by teenage insecurity, fear of his father, and a deep love for his mother," (Docket No. 23 at 22), there was no evidence of this during the court's interview with Harrison. He was very self-assured and certain of his preference and articulated meaningful and legitimate reasons for his preference. Although he did indeed display a love for his mother, he did not display a fear of his father or any indication that he had been manipulated or coerced. As Harrison's preference is consistent with the Hague Convention's default rule requiring his return to Germany, the maturity exception does not apply.

Whether Tydings possesses the age and maturity level sufficient to take his preferences into account is a closer question. Although Tydings is quite evidently an intelligent child, the reasons he provided for wishing to remain in the United States—the facts that he finds school easier here and that he can play soccer here—are notably different in nature from the reasons that Harrison provided, even in light of the difference in their ages. Additionally, Tydings appeared to color his remarks in favor of staying in Tennessee. For example, Tydings denied learning German while living in Germany during the first five years of his life, an assertion belied by his pronounced German accent. As the Respondent has not demonstrated by a preponderance of the evidence that Tydings has attained a maturity level sufficient to take his preference into account, the maturity exception does not apply to overcome the Convention's default rule that Tydings be returned to Germany along with his older brother.

## III.    Costs

The Petitioner asserts that he is entitled to costs associated with obtaining the return of the children to Germany.  Under ICARA, when a court orders the return of a wrongfully retained child, the court "shall order the respondent to pay any necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees . . . and transportation costs related to the return of the child."  42 U.S.C. § 11607(b)(3).  The court may not order such costs only if the respondent "establishes that such order would be clearly inappropriate."  *Id.*

Although the statute mandates an order requiring the Respondent to pay costs associated with the children's return to Germany, the Respondent has not addressed this issue in her previously submitted briefs.  She will have ten days to provide evidence demonstrating that an order for costs would be clearly inappropriate in this case.  Otherwise such order will be entered.


## CONCLUSION

Although the Respondent raises some troubling questions about the Petitioner's alleged manipulative and controlling behavior during the course of their marriage, it is inappropriate for a United States court to further investigate or rule on such matters.  The Petitioner has established that the McClary children were wrongfully retained in the United States.  The Respondent has not established that the maturity exception applies to overcome the Hague Convention's general rule requiring the return of wrongfully retained children to their habitual residence.  Thus, the Petitioner's motion for summary judgment will be granted.

This court has the utmost confidence that the German courts, which will properly exercise jurisdiction over the underlying custody dispute, will give a complete hearing to the issues raised by both parties and formulate a resolution that is fair and just.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge